IRVING COHEN
233 Broadway, Suite 2701
New York, New York 10279
(212) 964-2544
Attorney for Plaintiff
(IC 3708)

12 CIV 5008
JUDGE KOELTL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- x

MYRIAM MOLLER-FOLEY


                         Plaintiff,

CITY OF NEW YORK, OFF. (FNU) QUIS (Shield No.31943)
OFF. JOHN AND JANE DOES, POLICE  OFFICERS FOR
THE CITY OF NEW YORK, INDIVIDUALLY AND AS
POLICE OFFICERS FOR THE CITY OF NEW YORK,
                         Defendants

-------------------------------------------------------------------------- x

COMPLAINT AND
DEMAND FOR JURY TRIAL

12 CV 5008 (JGK)


## INTRODUCTION

1.  This is an action for damages for the wrongful acts of defendants NEW YORK CITY and

OFF. (FNU) QUIS, OFF. JOHN and JANE DOES of the New York City Police Department, all

acting under color of state law and pursuant to their authority, in violation of plaintiff's rights under

the Constitution and laws of the United States and the State of New York.

2.  Plaintiff alleges that beginning on or about July 14, 2011, defendants committed wrongful

and illegal acts against Plaintiff by falsely arresting her and imprisoning her, maliciously prosecuting

her, and violating her Federal and New York State civil rights.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

1

## JURISDICTION

3. This action is brought under 42 U.S.C. Section 1983 in conjunction with the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and the constitutional, statutory and common laws of New York State.

4. Jurisdiction is invoked herein pursuant to the aforementioned statutory and constitutional provisions and pursuant to 28 U.S.C. Section 1331 and 1343, this being an action seeking redress for the violation of the plaintiff's constitutional and civil rights.

5. Plaintiff furthers invokes this Court's pendant jurisdiction over any and all state law claims and causes of action which derive from the same nucleus of operative facts that give rise to the federally based claims and causes of action, pursuant to Title 28, U.S.C. section 1367.

6. Venue is laid within the United States District Court for the Southern District of New York in that the actions complained of occurred in the Southern District of Ne w York.

## TRIAL BY JURY

7. Plaintiff demands a trial by jury on each and every one of her claims as pled herein.

## PARTIES

8. At all times relevant hereto, plaintiff MYRIAM MOLLER-FOLEY was a resident of the Bronx, New York.

9. At all times relevant hereto, defendant NEW YORK CITY was and is a municipality of the State of New York and owns, operates, manages, directs and controls the New York City Police Department, which employs the other named defendants.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

2

10. Defendant (FNU) QUIS is and was at all times relevant to this action a police officer, employed by the New York City Police Department, and acting under color of state law. He is being sued in both his individual and official capacities.

11. Defendants JOHN and JANE DOES are and were at all times relevant to this action police officers, employed by the New York City Police Department, and acting under color of state law. They are being sued in both their individual and official capacities.

12. At all times relevant hereto and in all their actions described herein, defendants (FNU) QUIS, JOHN AND JANE DOES were acting under color of the statutes, ordinances, regulations, policies, customs and usages of the New York City Police Department and New York City, pursuant to their authority as employees, servants and agents of the New York City Police Department, within the scope of employment and incidental to their otherwise lawful duties and functions as employees, servants, agents and police officers.

13. The conduct and injuries complained of herein ensued without any negligent or culpable conduct on the part of plaintiff.

## NOTICE OF CLAIM

14. On January 17, 2012, plaintiff's Notice of Claim was filed with the Comptroller's Office of the City of New York. More than thirty days have elapsed since the filing of the Notice of Claim and this matter has not been settled nor otherwise disposed of.

15. On March 9, 2012, a hearing pursuant to New York State General Municipal Law §50-h was held at which time plaintiff Myriam Moller-Foley was questioned by a representative of defendant New York City.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

3

16. The transcript of this hearing is attached hereto as Exhibit A and as factual support for the causes of action alleged herein and is made a part of this Complaint.

## FACTUAL BACKGROUND

17. Plaintiff Myriam Moller-Foley was living at 2911 Coddington Avenue, Bronx, New York during the summer of 2011.

18. Ms. Moller-Foley is 62 years old and has suffered four strokes since the early 1990's.

19. In the past she worked at the United Nations and at Citibank.

20. Ms. Moller-Foley has always been and continues to be a lover of animals.

21. Her downstairs neighbor, Jason Jaime, owned a terrier dog.

22. At some point, a woman named Michelle Lorenz took up residence with Mr. Jaime along with her six or seven year-old son.

23. Ms. Lorenz was pregnant.

24. Ms. Moller-Foley had a conversation with Ms. Lorenz concerning the dog.

25. In this conversation, Ms. Lorenz said that she was fed up with Mr. Jaime having this dog in the apartment; that she had a child and was pregnant and that she was overwhelmed.

26. Ms. Lorenz also said that she would be happy if the dog was taken away when the baby arrived, expressing these feelings in a scatological manner.

27. Soon after, Mr. Jaime claimed to have lost this terrier dog around June 11, 2011.

28. Ms. Moller-Foley saw a photograph of the dog on the website of the New York City Animal Shelter on June 13, 2011.

29. Ms. Moller-Foley was told that the dog was a stray that had been dropped off at the shelter.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

30. If the dog were not to be claimed by its owner-or adopted-it would be euthanized.

31. Ms. Moller alerted Mr. Jaime that the dog was now at the Shelter by placing a printout of the dog's photograph under his door.

32. Ms. Moller told Mr. Jaime about the dog being at the Shelter later that same day.

34. She told him that the dog would be euthanized if he did not claim the dog within a short period of time.

35. Mr. Jaime expressed indifference to this fact intimating on that day and on many later days that it was not his dog.

36. Apparently, a fee would have to be paid for the dog to be claimed.

37. Ms. Moller offered Mr. Jaime money, if he needed it, to retrieve the dog from the Shelter.

38. Over one week passed and Mr. Jaime had not retrieved the dog.

39. As a result, Ms. Moller-Folley decided to adopt the dog.

40. On June 19, 2011, she went to the Shelter and was told the dog was to be put to sleep the next day.

41. She filled out all the appropriate papers to legally adopt the dog.

42. Ms. Moller-Folley paid all the appropriate fees.

43. She paid for the dog's medical examination and for the dog to be "fixed."

44. She obtained all the legal papers documenting her adoption of the dog.

45. Ms. Moller-Foley brought the dog home.

46. She then spoke to Mr. Jaime in order for him to have his pet back.

47. She told him that he did not have to reimburse her for the costs she paid to retrieve the dog from the Shelter.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

48. Ms. Moller-Foley asked him to sign a paper releasing her from responsibility for the dog once he obtained the dog from her.

49. Mr. Jaime refused so Ms. Moller-Foley retained possession of the dog.

50. Over one month later, on or about July 14, 2011, Mr. Jaime, it appears, called the police.

51. Defendant Police Officer Quis of the 45th Precinct arrived at Ms. Moller-Foley's residence along with about eight other uniformed officers.

52. The police pushed Ms. Moller-Foley and insisted that she had stolen the dog.

53. Ms. Moller-Foley told Off. Quis that she had legally adopted the dog.

54. She presented Off. Quis with all the documents she possessed demonstrating this legal adoption.

55. These included the following attached as exhibits:

(B)    Receipt of dog license;
(C)    Receipt for S/N deposit;
(D)    Adoption Agreement;
(E)    Animal Condition Agreement;
(F)    Shelter photograph and lost dog announcement;
(G)    New York City Dog License.

56. The Officer told her the documents were "bogus", tossed them away, took the dog away and gave it to Mr. Jaime.

57. Ms. Moller-Foley called a lawyer who spoke to Off. Quis at that time and explained to him that she was now the legal owner of the dog and was committing no crime.

58. Nevertheless, Off. Quis arrested Ms. Moller and took her into custody, placing handcuffs on her while twisting her arm.

59. Off. Quis took her to the 45th Precinct.

Irving Cohen
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

60. At the precinct, Ms. Moller-Foley was paraded in front of everyone with the police acting like it was a show saying, in substance, "Here is this old lady who steals dogs, probably to sell them."

61. Ms. Moller-Foley was placed inside a cell-still handcuffed.

62. She was kept in the precinct for about three to four hours while the police tried to obtain proper fingerprints and photographs.

63. After about eight hours, Ms. Moller-Foley, who had not been able to take her blood pressure medicine, was feeling ill.

64. EMT arrived and took her to Jacobi Hospital even though she said she wanted to go to Montefiore Hospital where her doctors and records were.

65. At the hospital, Ms. Moller-Foley remained handcuffed.

66. She was returned to the precinct and remained there another two-and-a-half hours.

67. Apparently after speaking with more senior and supervising Officers, Off. Quis issued Ms. Moller a desk appearance ticket (DAT) to appear in court on October 4, 2011. (Exhibit H)

68. Ms. Moller was charged with Criminal Possession of Stolen Property despite the fact that she legally owned and possessed the dog.

69. Ms. Moller retained a lawyer to represent her.

70. Ms. Moller and her attorney appeared in court on October 4, 2011, but the case was adjourned.

71. She and her lawyer appeared once again in Criminal Court on November 3, 2011.

72. On that date, Ms. Moller was arraigned on a Criminal Court complaint charging her with Criminal Possession of Stolen Property in the Fifth Degree. (Ex. I).

73. She again appeared in court on December 14, 2011 with her lawyer.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

7

74. On that date, the case was dismissed. (Ex. J)

75. As a result of the treatment by the police, Ms. Moller-Foley 's blood pressure increased dramatically.

76. She suffered several "TIA's".(Transient ischemic attack, often referred to as a mini-stroke).

77. She has been prescribed stronger medication.

78. She also saw a cardiologist.

79. Because of the incident, she was forced to move from the home and neighborhood she had lived in for almost fourteen years.

80. On the date that she moved, December 15, 2011, some of the same officers came to her house with their guns drawn.

81. She was ordered to put her hands up.

82. The officers claimed to be investigating a (totally unrelated) crime.

### COUNT ONE: VIOLATION OF CONSTITUTIONAL RIGHTS

83. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-82 of this complaint, as though fully set forth herein.

84. The acts, omissions and conduct of the defendants, all members of the New York City Police Department, and all acting under color of state law, deprived plaintiff of her rights, privileges and immunities under the laws and Constitution of the United State; in particular the rights to be secure in their person and property, to be free from false arrest, false imprisonment, malicious prosecution, excessive force and cruel and unusual punishment and to due process.

85. By these acts, omissions and conduct, these individual defendants have deprived plaintiff of rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

Constitution, in violation of 42 U.S.C. Section 1983, for which the defendants are individually liable.

## COUNT TWO: VIOLATION OF CONSTITUTIONAL RIGHTS
### (Defendant New York City)

86.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-85 of this complaint, as though fully set forth herein.

87.    The acts, omissions and conduct of defendant New York City, as set forth above, deprived plaintiff of her rights, privileges and immunities under the laws and Constitution of the United States; in particular the rights; to be secure in their person and property; to be free from unlawful seizure, false imprisonment, malicious prosecution; excessive force and cruel and unusual punishment and to due process.

88.    By these acts, omissions and conduct, defendant New York City has deprived plaintiff of rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. Section 1983.

## COUNT THREE: CONSPIRACY TO VIOLATE CIVIL RIGHTS

89.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-88 of this complaint as though fully set forth herein.

90.    The defendants conspired to violate plaintiffs' civil rights by agreeing between themselves to falsely charge them with crimes as described above, in violation of 42 U.S.C. 1983, for which defendants are individually liable.

## COUNT FOUR: FALSE ARREST

91.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-90 of this complaint, as though fully set forth herein.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

92. The acts, omissions and conduct of defendants as alleged above, constitute false arrest under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

## COUNT FIVE: FALSE IMPRISONMENT

93. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-92 of this complaint, as though fully set forth herein.

94. The acts, omissions and conduct of defendants, as alleged above, constitute false imprisonment under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

## COUNT SIX: ASSAULT

95. Plaintiff repeats and re-alleges the allegations in paragraphs 1-94 of this complaint, as though fully set forth herein.

96. The acts and conduct of defendants, as alleged above, constitute assault under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

## COUNT SEVEN: MALICIOUS PROSECUTION

97. Plaintiff repeats and re-alleges the allegations contained in paragraph 1-96 of this complaint, as though fully set forth herein.

98. Tthe acts, omissions and conduct of defendants, as alleged above, constitute malicious prosecution under the laws of the State of New York. This Court has pendant jurisdiction to hear and adjudicate such claims.

## COUNT NINE: RESPONDENT SUPERIOR LIABILITY
### (Defendant New York City)

99. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-98 of this complaint, as though fully set forth herein.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

100.   At all times pertinent hereto, defendants, were acting within the scope of their employment as officers of the New York City Police Department.

101.   Defendant New York City is thus liable under the doctrine of respondeat superior, for the intentional torts of defendants, committed within the scope of their employment.

### COUNT TEN: NEGLIGENCE

102.   Plaintiff repeats and re-alleges the allegations contained in paragraph 1-101 of this complaint, as though fully set forth herein.

103.   The defendants, while acting as agents and employees for New York City, owed a duty to plaintiff to perform her duties without violating plaintiff's constitutional rights.  Defendants' conduct constitutes negligence for which these defendants are individually liable.

### COUNT ELEVEN: NEGLIGENCE
### (Defendant New York City)

104.   Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-103 of this complaint, as though fully set forth herein.

105.   Defendant New York City owed a duty to plaintiffs to adequately screen prospective police officers, and to train, supervise and otherwise control its police officers in the use of their powers incidental to their employment.  Defendant New York City failed to provide adequate screening, training, supervision, and control of the individual defendants, which failure constitutes negligence.

WHEREFORE, plaintiff demands the following relief;

a.  Compensatory damages in the amount of two million ($2,000,000 dollars).

b.  Punitive damages in the amount of two million ($2,000,000 dollars).

c.  Reasonable attorneys fees and costs; and

d.  Such other and further relief as appears reasonable and just.

IRVING COHEN
ATTORNEY AT LAW
233 BROADWAY
NEW YORK, N.Y. 10279

Dated: New York, New York
      June 26, 2012

                               IRVING COHEN
                               Attorney for Plaintiff
                               233 Broadway, Suite 2701
                               New York, New York 10279
                               (212) 964-2544

ORIGINAL

50-H HEARING

015220

```
-----------------------------------x  BLA: 2012PI001727
           IN THE MATTER OF THE CLAIM

                    OF

MYRIAM MOLLER-FOLEY,

                 Claimant,

      -against-

THE CITY OF NEW YORK and NEW YORK CITY POLICE

DEPARTMENT,

                 Respondents.

-----------------------------------x
```

Shapiro, Beilly & Aronowitz
225 Broadway
New York, New York 10007

March 9, 2012
1:21 P.M.

50-H HEARING of MYRIAM MOLLER-FOLEY, the

Claimant in the above-entitled action, held at

the above time and place, pursuant to Notice,

taken before Madeline Lopez, a shorthand

reporter and Notary Public within and for the

State of New York.

```
 1

 2     A P P E A R A N C E S:

 3

 4          IRVING COHEN, ESQ.
                 Attorneys for Claimant
 5               233 Broadway
                 New York, New York 10279
 6

 7

 8

 9          SHAPIRO, BEILLY & ARONOWITZ, L.L.P.
                 Attorneys for Respondents
10               225 Broadway-13th Floor
                 New York, New York 10007
11
            BY:  DAWN SHWARTZ, ESQ.
12               FILE NO.  NYC-2796

13

14

15                        xxxxx

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2    M Y R I A M     M O L L E R - F O L E Y, the
 3    witness herein, having been first duly sworn
 4    before a Notary Public of the State of New
 5    York, was examined and testified as follows:
 6    EXAMINATION
 7    BY MS. SHWARTZ:
 8        Q.  Please state your name for the record.
 9        A.  Myriam Moller-Foley.
10        Q.  Please state your address for the
11    record.
12        A.  33-57 164th Street, Flushing, New York
13    11358.
14        Q.  Good afternoon, ma'am.  My name is Dawn
15    Shwartz and I represent the City for the
16    purposes of today's hearing and I'm going to be
17    asking you some questions about your claim
18    against the City.
19            I'm going to ask that all of your
20    answers to my questions are verbal so that the
21    court reporter can take down everything we are
22    saying because she can't take down head shakes,
23    head nods or hand gestures.
24            If you don't understand my question,
25    let me know and I will rephrase it for you or
```



                        Moller-Foley

1

2    say it in a different way. If you answer my

3    question, I'm going to assume that you

4    understood it.

5          If you need to take a break or speak

6    with your attorney for any reason, that's not a

7    problem.  All you have to do is answer the last

8    question I asked you before you go ahead and do

9    that.

10        **A.  Okay.**

11        Q.  I'm also going to ask that even if you

12   know what I'm going to ask you and you already

13   know what I'm going to say, let me finish

14   asking the question and then give your answer

15   because she can only take down what one of us

16   is saying at a time, okay?

17        **A.  Okay.**

18        Q.  How long have you lived at the address

19   that you just gave us?

20        **A.  I moved on December 15th.**

21        Q.  Of 2011?

22        **A.  Of 2011.**

23        Q.  Where did you live prior to that?

24        **A.  2911 Coddington Avenue, Bronx, New York**

25   **10461.**

Reporter's Ink, Corp.  90 John Street - Ste. 411     New York, NY 10038     www.reporters-ink.com
Phone: 646.395.2522     Fax: 212.374.1236



```
1                        Moller-Foley
2        Q.   Is that a private home or an apartment?
3        A.   It's a private household.
4        Q.   How long did you live there for?
5        A.   Seven years.
6        Q.   At your current address in Flushing
7   does anyone live there with you?
8        A.   It's a two family place -- currently
9   with me my son, Shawn Foley.
10       Q.   Anyone else besides you and your son?
11       A.   My pets -- just my pets.
12       Q.   When you resided at Coddington Avenue,
13  did anyone else live there with you?
14       A.   My son.
15       Q.   Shawn?
16       A.   Yes.
17       Q.   Anybody else?
18       A.   No one else.
19       Q.   What is your Social Security number?
20       A.   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.
21       Q.   And your date of birth?
22       A.   10/20/49.
23       Q.   Where were you born?
24       A.   Chile.
25       Q.   When did you come to the United States?
```

1                        Moller-Foley

2       A.   1969 -- Yes, 1969.

3       Q.   Are you currently employed?

4       A.   No, I'm not.

5       Q.   In November of last year, were you

6    employed?

7       A.   No. I haven't been working since 2001.

8

9       Q.   Are you currently receiving any

10   Medicaid benefits?

11      A.   Medicaid benefits --

12      Q.   Those are benefits through the State of

13   New York or the City of New York?

14      A.   I have health insurance, but I don't

15   know if that's Medicaid. I think it's Medicare

16   because of my age, but actually I don't use it

17   much because my son has my insurance with him--

18   through his employer I have insurance.

19      Q.   Have you ever filed a claim against the

20   City of New York before?

21      A.   Never.

22      Q.   Have you ever filed a claim against the

23   State of New York before?

24      A.   Never.

25      Q.   Are you familiar with an individual by



2    the name of Jason Jaime?

3        A.   Yes.

4        Q.   How do you know that person?

5        A.   That person moved into 2911 Coddington

6    I believe last year -- the beginning of 2011 to

7    the basement apartment that's below my own

8    apartment.

9        Q.   2911 Coddington, is that a house that

10   has a number of different floors that people

11   live in or something else?

12       A.   It's supposed to be two dwellings, but

13   the landlord managed to rent the basement which

14   we know is an illegal thing.

15       Q.   And which dwelling did you live in?

16       A.   I live where the owners used to live,

17   which is called the first floor, which is the

18   middle.

19       Q.   And Mr. Jaime lived in the basement

20   apartment?

21       A.   In the basement apartment, yeah.

22       Q.   Okay.  When Mr. Jaime moved into the

23   Coddington Street apartment, did he have any

24   pets?

25       A.   No, he didn't have when he just moved



```
1                        Moller-Foley

2    in. He brought a pet I will say two or three

3    months after he moved in.

4        Q.   What type of pet did he bring?

5        A.   Well, it's a small dog so I'm not very

6    familiar with the -- it look like a terrier.

7        Q.   A dog though?

8        A.   Yeah, a dog. It looked like a terrier,

9    but I cannot specify exactly what it was.

10       Q.   At any time did you have a conversation

11   with Jaime regarding that dog?

12       A.   No. I never had a conversation with him

13   directly.

14       Q.   Did you have a conversation with

15   anybody regarding that dog?

16       A.   I don't know if it's his wife or

17   girlfriend who was pregnant at that time.

18       Q.   Do you recall her name?

19       A.   Michelle Lawrence.

20       Q.   Did Ms. Lawrence live there with

21   Mr. Jaime?

22       A.   Yes. She moved in with her son about

23   six, seven year-old.

24       Q.   When you had the conversation with

25   Ms. Lawrence about the dog, what did you two
```



```
 1                    Moller-Foley

 2    talk about?

 3         A.   It was very funny. It was summer and

 4    she was very upset, very upset and she was --

 5    she was -- I saw because she wasn't feeling

 6    well because of her pregnancy so I said,

 7    "What's wrong?  Can I help you?"  She said,

 8    "I'm fed up.  I'm fed up Jason bring this dog

 9    over here.  I'm pregnant.  I have my kid.  I'm

10    overwhelmed and I have to give him a bath to

11    this dog. I can't do everything."  So she was

12    really, really upset and using bad words also

13    to address that problem.

14         Q.   Did she ever talk about giving the dog

15    away or getting rid of the dog?

16         A.   She said exactly in front of her own

17    mother she will be more than happy if that dog

18    will be taken away because when the baby

19    arrived, she won't be able to take care of that

20    dog and the apartment was too small and it was

21    too much for her, but I'm summarizing because

22    she was using bad words.

23         Q.   Did she say if it was Mr. Jaime's dog

24    or it was her dog?

25         A.   Once she said was -- her husband
```



                         Moller-Foley

1

2   mother's dog and then in another occasion --

3   later on she kept saying it was her husband's

4   dog.

5       Q.  When she said that she'll be happy for

6   the dog to be taken away, did you have anything

7   to say in response to that?

8       A.  No. I didn't say anything because I

9   have my two pets, my two cats and my big dog.

10  I always felt that it was enough for me at that

11  moment to have that amount.

12      Q.  At any time after that did you ever

13  indicate to either Ms. Lawrence or Mr. Jaime

14  that you would interested in taking care of

15  that dog?

16      A.  No. Until they said that the dog was

17  lost.  And that happens on June 11th when they

18  knocked my door and they told me that the dog

19  was missing.

20      Q.  This was June 11th of 2011?

21      A.  Exactly and then they asked me if I

22  have the dog and I said, "No, I won't bring

23  your dog inside unless you allow me to.  I

24  won't bring any other pets in front of my

25  pets."  My pets are inside pets.  They're not



1                      Moller-Foley

2    outside pets.

3        Q.   On June 11th of last year, did you know

4    where Mr. Jaime's dog was?

5        A.   No. They say it was missing and if I

6    have seen it and I said no.  I recall vividly

7    that day because I was in this area, Brooklyn

8    Bridge, because my son was taking a test for

9    the City and he forgot his ID, so I have to

10   come down to bring his ID to this area.

11           So when I come home around 3 or

12   4 o'clock they asked me if I have the dog with

13   me I said, "No.  Why I'm going to take your dog

14   inside my house?"

15       Q.   At any time prior to June 11th of 2011

16   had you ever brought Mr. Jaime's dog into your

17   home?

18       A.   Never.

19       Q.   After June 11th of 2011, did Mr. Jaime

20   or Ms. Lawrence ever contact you again

21   regarding the dog?

22       A.   They kept knocking the door, knocking

23   the door and they kept asking me if I can help

24   them to look around because they didn't have

25   time to go into the neighborhood.  So I advised



1                     Moller-Foley

2   them this way.  I said the best thing for you

3   to do is call the shelters, call the other

4   things for animal rescue and tell them the

5   description of your dog.  So they say they were

6   going to do that.

7       Q.  How many different times did they knock

8   on your door to ask you about the dog?

9       A.  During that day -- during that day

10   three, four times.

11      Q.  What about after that day?

12      A.  After that, they didn't seem to be

13   bothered or interested in asking me if I knew

14   anything.  They didn't.

15      Q.  After June 11th of 2011, did you ever

16   see that dog again?

17      A.  Well, this is what happens.  I am in

18   the internet most of the nighttime.  I'm a

19   night person, so I went to the internet and I

20   went into a website of lost pets and I started

21   looking, looking, looking and I give him the

22   picture of one that was similar, but he told me

23   that wasn't his pet.

24      Q.  You gave who a picture, Mr. Jaime?

25      A.  To Mr. Jaime. I took a printout and it



```
 1                    Moller-Foley

 2   was a dog with a different name and different

 3   color and he said it wasn't his dog.

 4       Q.  Do you remember what website you got

 5   that from?

 6       A.  I can show you this because it is the

 7   only paper that I have and I don't wanna loose

 8   this.

 9             MR. COHEN:  Is it a photo?

10             THE WITNESS:  Yes.

11             MR. COHEN:  Oh, I have that.

12             THE WITNESS:  They have this one

13             with the name Sunflower and he says it

14             wasn't his dog.

15             MS. SHWARTZ:  Let the record

16             reflect the Claimant has provided a

17             photocopy of a computer printout from

18             www.petharbor.com showing a dog by the

19             name of Sunflower, a male tan and gray

20             silky terrier mix.

21             THE WITNESS:  Here's in color.

22             MS. SHWARTZ:  Okay, thank you.

23       A.  So I posted this in his door around

24   1 o'clock in the morning and I post another

25   copy under and I said to them "I think that's
```