Moller-Foley

1

2    appearance" or something like that.

3        Q.  Desk appearance ticket?

4        A.  Yeah.

5        Q.  What did that ticket say?

6            MR. COHEN:  You want a copy of it?

7            MS. SHWARTZ:  If you have it.

8        A.  I don't recall the --

9        Q.  That's okay. Your attorney I think has

10   a copy of it.

11           MS. SHWARTZ:  Claimant's counsel

12           has provided a copy of the D.A.T.

13       Q.  Did you go back to Court on

14   October 4th?

15       A.  I went to Court every time they asked

16   me to.

17       Q.  How many different times did you go to

18   Court?

19       A.  Well, I think it was October, November

20   and December.  Anywhere from three to four

21   times.

22       Q.  The last time you went to Court, what

23   happened?

24       A.  December 14th.

25       Q.  What happened on December 4th?



1                    Moller-Foley

2          A.   Judge Adler, I remember that he looked

3    all the papers and he says, "What is this?" He

4    says, "What have you been doing to this woman?

5    What is going on?"

6          Q.   Did he dismiss the charges against you?

7          A.   Yes.

8          Q.   He dismissed them completely; you

9    didn't have to go back to Court at all?

10         A.   No.

11              MR. COHEN:   You want a certificate?

12              MS. SHWARTZ:   No, that's attached

13         to the notice of claim that I have.

14         Q.   When you were released from the

15   precinct --

16         A.   Yeah.

17         Q.   That night after you got home, did you

18   ever have to go to the doctor for any medical

19   care from anything happened while you were in

20   police custody?

21         A.   Honestly, my blood pressure hasn't been

22   able to come down less than 198 and I've been

23   having a few PIA's they're called.

24         Q.   Has your doctor changed your

25   prescription at all?



1                    Moller-Foley

2       A.   He gave me more strong medicine for

3    that.

4       Q.   Aside from giving you a little bit --

5    different medicine, has he changed anything

6    else?

7       A.   He give me more of the blood pressure.

8    He give me the option to change to other one

9    who will cause me some side effects or

10   increased -- increase the pill instead of one

11   should take two.

12      Q.   Is this your cardiologist or your

13   primary care doctor?

14      A.   My primary care.

15      Q.   What's his name?

16      A.   Dr. Pirelli.

17      Q.   Aside from Dr. Pirelli, did you go see

18   anybody else after you were released from

19   custody?

20      A.   Yeah, the cardiologist and they told me

21   that I was under a lot of stress and they know

22   about this.

23      Q.   What's the name of your cardiologist?

24      A.   Oh, gosh, it's -- Dr. Pirelli send me

25   all the time.



1                      Moller-Foley

2       Q.   It's okay. We'll leave a blank in the

3    transcript and ask that it be provided.

4    REQUEST NOTED:

5       A.   They're all recommended by my primary.

6    He has the records so --

7       Q.   Okay.  Did you ever go see a

8    psychiatrist or a psychologist regarding what

9    had happened?

10      A.   No. I don't believe in psychiatrist or

11   psychologist.

12      Q.   Prior to this whole incident with the

13   dog happening, what was your relationship like

14   with Mr. Jaime?

15      A.   I never met him before.  I've been

16   living in that area.  I used to live next door

17   seven years and we live seven years in the

18   other, so I've been twelve -- almost fourteen

19   years in the same area and I never had any

20   problem with any neighbor.  And he move in just

21   a few months, like nine months.

22      Q.   In that nine month period of time did

23   you have any arguments or problems with him?

24      A.   No. I never had any problem. I tried to

25   avoid him for two reasons because I don't know



1                      Moller-Foley

2      if I should say this, but he was always --

3      between 10:30 and 11:00 a.m. smoking something

4      that make my stomach upset.  It's not funny.  I

5      don't know what it is.  My son give a name, but

6      I don't have no idea.

7          Q.  Did you think he was smoking something

8      illegal?

9          A.  He is -- he does -- he is and he does

10     and --

11         Q.  Did you ever talk to him about that or

12     ask him to stop?

13         A.  It wasn't my business to tell him not

14     to do that and if you tell those people to

15     stop, you don't know how they're gonna react.

16         Q.  Did you ever report him to anybody,

17     either the landlord or the police?

18         A.  I mention it to the landlord once.

19         Q.  Anybody else besides the landlord?

20         A.  When the baby was born I -- the smell

21     increased.  It was at nighttime and it was

22     daytime.  I have to tell you because his step

23     is here and my windows from the bathroom and my

24     son's bedroom was here, so sitting there in the

25     step and smoking you can --



```
 1                    Moller-Foley
 2        Q.   So your window's right above the steps?
 3        A.   Exactly.
 4        Q.   And when you say the baby, you mean Ms.
 5    Lawrence's baby?
 6        A.   The newborn, yes, the newborn. I
 7    mentioned it to Susan my friend and she said
 8    well, you should go and call children's
 9    protection and other people also told me my
10    neighbor to the right also was upset because he
11    says he can't even open the windows anymore
12    because the smell of --
13        Q.   Did you ever call Child Protective
14    Services?
15        A.   No, I didn't.
16        Q.   Did you ever call anybody else
17    regarding the smoking after the baby came?
18        A.   No, I didn't.  Not myself, no.
19        Q.   Do you know if anybody did?
20        A.   I hear that some people did, but I'm
21    not sure if they did or not because they say
22    they were going to do.
23        Q.   Do you know if your son ever made any
24    calls or complaints?
25        A.   He might. I don't know.  I don't know.
```



1                            Moller-Foley

2      **That I don't know.**

3            Q.   Did your son ever have any type of

4      argument or altercation with Mr. Jaime or

5      Ms. Lawrence?

6            **A.   With nobody.**

7                  MR. COHEN:   I want to go off the

8                  record.

9                  (Whereupon, an off the record

10                 discussion was held.)

11           Q.   At any time after you were released

12     from the precinct, did you ever see any of

13     those same cops that had been in your home

14     again after that?

15           **A.   They kept going every time because the**

16     **lady on the top floor who is the divorced now**

17     **she used to be married to a cop, so every time**

18     **she called they were there during the week**

19     **three times.**

20           Q.   Were these the same officers that were

21     in your house on July 14th?

22           **A.   Always the same group.**

23           Q.   Did they ever come to your part of the

24     house?

25           **A.   Yes, they come to my part of the house.**

---

                         Moller-Foley

1

2    They told me that the woman upstairs was saying

3    that I insulted her. They would say the ones

4    downstairs they say that I was taking their

5    mail.

6        Q.  After you were released from the

7    precinct, the time that you got arrested, how

8    many separate times did these officers come

9    back to your house?

10       A.  Almost every other day.  It was a joke.

11   My neighbors, the one that knows me for more

12   than ten years, they say what is going on

13   Myriam and when I call they never show up or

14   when they did show up three, four hours later

15   to complain about my plant being destroyed or

16   being attacked throwing my plants at me, they

17   pretend to take a report and they told me,

18   well, you can pick up the report tomorrow. I

19   will go to pick up the report and they say oh,

20   well, we don't have it.  It was a neighbor

21   thing so we didn't make a report so --

22       Q.  You told me before that at some point

23   you moved out of 2911 Coddington Avenue, right?

24       A.  We were looking very early on when we

25   saw that things were getting too bad.  We said



                          Moller-Foley

1

2      that we want to leave -- always we live in nice

3      places.

4          Q.  You eventually moved out of Coddington

5      Avenue, correct?

6          A.  Yes, we did on the 15th of December.

7          Q.  On the 15th of December, 2011?

8          A.  Yes.

9          Q.  On that date did any of those police

10     officers come to your home that day?

11         A.  Yes, the one who handcuffed me and the

12     one who have the dog, he showed up over there

13     very excited that night after several police

14     went with the gun like this going up and call

15     me -- _

16         Q.  On the 15th they came to your house

17     with their guns out?

18         A.  Yes.

19         Q.  Did they knock on your door?

20         A.  No, no. The door is opened. The van of

21     my friend is right there next to the door. I

22     just put the cat in a kennel and I put my

23     German Shepherd Labrador in a kennel.

24             So we went up to retrieve the garbage

25     bag that we have and my plants which I have

---



1                    Moller-Foley

2    this much of plants like this from wall to wall

3    (indicating).

4              So were taking the plants -- big plants

5    downstairs and I had about five more to go when

6    all of a sudden you see "Hands up.  Hands up.

7    Don't move.  Come downstairs".

8              One group saying we go downstairs or I

9    should go downstairs and the other than keep

10   going up.  So I didn't move. I stay against the

11   window next to my plant.

12      Q.   This was inside your apartment?

13      A.   Inside my apartment and the guy said --

14   the first officer because there were seven. I

15   count them. They were all with there guns out.

16   The first officer says, "Who is here with you?"

17   I said, "Just my helper" because helper I call

18   the person that we pay them to help me to take

19   the stuff.

20      Q.   This person that was helping you, was

21   this a friend of yours or someone from a

22   company that was helping you?

23      A.   No someone -- Susan my friend

24   recommended me to this fellow who does moving.

25      Q.   What's his name?



1                         Moller-Foley

2        A.   Ray -- I don't know his last name.

3        Q.   We'll leave a blank again in the

4   transcript and you can tell your attorney

5   later.

6        A.   Okay.

7   REQUEST NOTED:

8        Q.   So when the officers came in with their

9   guns out, what did they do next?

10       A.   When they got close to me they said,

11  "Who is with you?", insisting many times

12  insisting who is with me.  I said, "It's just

13  me and the person who is helping to move."

14  "Move?  Where you moving?" I said, "I'm moving

15  to Queens, Flushing."

16           "Don't lie to me.  Don't lie to me".  I

17  said, "Officer, I'm not lying.  It's just two

18  people here."  So they went to -- the right was

19  supposed to be my bedroom.  They went to the

20  closet.  They went to the kitchen and I could

21  hear open doors and cabinets everywhere, going

22  downstairs to the part of the basement that it

23  was my part of my apartment and when they come

24  back they didn't have the guns.

25           They were -- their hand back -- put



```
 1                          Moller-Foley
 2    them back and I'm here surrounded by five new
 3    faces and behind them there are the seven that
 4    I'm talking about and they were all looking at
 5    me and I kept saying to my son, I said what
 6    they were looking.  They were saying this to me
 7    (indicating).
 8        Q.  Did they say anything to you or order
 9    you to do anything while they were inside your
10    home?
11        A.  They want me to go downstairs.
12        Q.  Why did they want you to go downstairs?
13        A.  I have no idea because by then they had
14    Raymond downstairs being searched in the street
15    and asking for documents and all kinds of
16    stuff.
17        Q.  Did you ever go downstairs with them?
18        A.  No, I didn't went downstairs.
19        Q.  After you did not go downstairs with
20    them, did they leave or did they do something
21    else?
22        A.  No. They stayed more than an hour there
23    talking between themselves.
24        Q.  After that hour was up, what did they
25    do next?
```

Reporter's Ink, Corp.   90 John Street - Ste. 411   New York, NY 10038   www.reporters-ink.com
Phone: 646.395.2522   Fax: 212.374.1236



```
 1                        Moller-Foley
 2          A.  Well, the new faces I would call the
 3     ones I never saw before, they say, "I'm sorry
 4     but we have to follow orders" and I said, "What
 5     kind of orders?" and they said, "Well, we got a
 6     call from Westchester that it was a shootout
 7     here.  One person was dead and other badly
 8     injured, so we have to follow the call."
 9          And that was said to me by a new
10     officer that I never seen before.  The others
11     one they never said nothing.  The others they
12     looked disappointed.  Let's put it that way.
13          Q.  After they determined that a shooting
14     had not taken place in your apartment, did they
15     leave?
16          A.  Yes, they left.
17          Q.  Did you ever see them again that night?
18          A.  Not that I know, but I recall one told
19     me -- one who was up there he said to me, "What
20     kind of dog you have?" I said, german shepherd
21     lab and he said, "Oh, I saw you when you put it
22     in the van."
23          So to me they were watching early on
24     what was happening and also to me -- I'm not a
25     police person. I'm no sovereign process but I
```



1                      Moller-Foley

2   see on the T.V. when someone is being shot at

3   they call on the whole block.  They investigate

4   in every household, in every floor and with the

5   neighbor and they didn't do that --

6        Q.  After the officers initially gave the

7   dog back to Mr. Jaime, did you ever see that

8   dog again?

9        A.  No.

10       Q.  Did you ever receive any money for that

11   dog?  Did they ever reimburse you for anything?

12       A.  No. As a matter of fact, I have the

13   name of an officer, Miniduchi (phonetic), who

14   was the one also who took the dog and he very

15   brave -- I would say brave, but it wasn't

16   brave-- very sarcastically he told my son and

17   myself, "If you prove that you are the owner of

18   the dog, I personally will deliver the dog to

19   your door."

20       Q.  And you never got that dog back

21   correct, yes or no?

22       A.  No.

23       Q.  I don't have any other questions for

24   you. Thank you very much for coming in today.

25                  (Time noted: 2:21 p.m.)



A 900088    P# 802631

**NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE**
Veterinary Public Health Services
Church Street Station, P.O. Box 4768
New York, N.Y. 10277-2004
(212) 676-2100

Name of Establishment: ACHC MS
Permit Number: 170952    Transaction Date 6/19/11

## RECEIPT FOR NEW YORK CITY DOG LICENSE

☑ Dog License Fee (Spay/Neuter)    $ 8.50
☐ Dog License Fee (Not Spay/Neuter)    $ 11.50

Total Enclosed    $8.50

Breed of Dog: Silky Terrier
Colors (Primary & Secondary): Tan - Grey
Sex & Age: M - 24/05    Name of Dog: MAX

Name of Owner: (Last Name) Moller - Foley    (First Name) Myriam
Home Address: 2911 Coddington Ave    Bronx
Apt. No.: P#    Zip Code: 10461

RECEIVED BY: Delores Harrison

Copies: White–Dog Owner's Copy; Canary–Department of Health (to be attached to license application); Pink–Establishment Copy

*...... , but replaced for another one at the front desk.....*

Application for a
**New York City Dog License**
Solicitud de Registro para Perros de la Ciudad de Nueva York
www.nyc.gov/doglicense



**Animal Care & Control** OF **NYC**

**Manhattan Center**
326 East 110th Street
New York, NY 10029
www.nycacc.org

| | |
|---|---|
| Receipt Date: | 011/06/19 00:00:00.0 |
| Receipt Number: | R11-029708 |

Person Information: MYRIAM MOLLER
2911 CODDINGTON AV PH
BRONX NY 10461
Phone:   (718) 319-9819

Received From:

Check No:

PID:  **P802631**

| Item: | Animal ID: | Price: | Each: | Amount: |
|---|---|---|---|---|
| ADOPTION DOG | A900427 | $65.00 | 1 | $65.00 |
| LICENSE - ALTERED | A900427 | 8.50 | 1 | 8.50 |
| DOXYCYCLINE-TABLET | A900427 | 10.00 | 1 | 10.00 |

| | | |
|---|---|---|
| | Total Fees Due: | **$83.50** |
| **Payments:** | Cash: | $83.50 |
| | Check: | $0.00 |
| | Credit Card: | $0.00 |
| **Total Payments Received:** | | **$83.50** |

### Thank You!

| | |
|---|---|
| Change: | $0.00 |
| Balance Due: | $0.00 |

*SGOVAN*                    *2011/06/19 18:48:34.97*                    *Manhattan Center*



**Manhattan Center**
326 East 110th Street
New York, NY 10029
www.nycacc.org

Receipt Date: | 011/06/20 00:00:00,0

Receipt Number: | R11-029756

Person Information: MYRIAM MOLLER
2911 CODDINGTON AV PH
BRONX NY 10461
Phone: (718) 319-9819

Received From: MYRIAM MOLLER

Check No:

PID: P802631

| Item: | Animal ID: | Price: | Each: | Amount: |
|---|---|---|---|---|
| S/N DEPOSIT | A900088 | $100.00 | 1 | $100.00 |

|  |  |  |
|---|---|---|
| Total Fees Due: | | $100.00 |
| Payments: | Cash: | $100.00 |
| | Check: | $0.00 |
| | Credit Card: | $0.00 |
| **Total Payments Received:** | | **$100.00** |

**Thank You!**

|  |  |
|---|---|
| Change: | $0.00 |
| Balance Due: | $0.00 |

*DHARRISO*          *2011/06/20 17:16:27.38*                    *Manhattan Cent*



## ADOPTION AGREEMENT
### Animal Care & Control of New York City
Manhattan Center
326 East 110th Street
New York, NY 10029
www.nycacc.org

Owner ID: P8(
Animal ID: A9(
Other ID:

Date: 6/1

**ADOPTER:**
MYRIAM MOLLER
2911 CODDINGTON AV. PH
BRONX, NY 10461
(718) 319-9819

**ANIMAL:**
MAX, A MALE, UNNEUTERED, DOG
APROX. 2 YEARS OLD, TAN/GRAY
SILKY TERRIER/MIX WITH NO MARKINGS
SOURCE: STRAY ON 6/11/2011

**VACCINATION RECORD**

| DATE | VACCINE/MEDICATION |
|------|--------------------|
| 6/12/2011 | DEWORMING DOG |
| 6/12/2011 | RE-EXAM |
| 6/11/2011 | DA2PP |
| 6/11/2011 | BORDETELLA |



985 121 009 553 560

**RABIES**
AC&C NYC TAG NUM: 11-36489

VACCINATED: 6/20/2011
BOOSTER DUE: 6/20/201:
PRODUCER: S / P
LOT NUM: 1062235
EXP DATE: 6/20/201:

**MICROCHIP:**
**SPAY/NEUTER:**

I agree to adopt an animal (the "Adoption") from Animal Care & Control of New York City ("AC&C"). As a condition to the Adopti
o:

(a) Provide the animal, at my own expense, with all necessary and humane care, including food, fresh water, shelter from extreme temperatures, excercise, training and affection;

(b) Provide the animal, at my own expense, with proper veterinary care, both on a regular basis and in the event that the animal be injured;

(c) *To the extent the animal has not been spayed or neutered as of the date of this agreement, return the animal to later than 60 days after the date of this agreement to be altered by a licensed veterinarian . I agree to leave a $1 deposit if the animal leaves unaltered and further understand that if I do not return in 60 days to have the ani. spayed/neutered, the deposit will be forfeited.* Also, if the payment is made by cash or check, it may take up to four weeks for processing the refund.

I understand and agree that the Adoption will not be effective until the alteration of the animal has been completed ; a

(d) Comply at all times and at my own expense with all applicatble town, city, state and federal license laws.

2. I acknowledge and agree that in the event that I fail to comply with the provisions set forth in paragraph 1 above, I shall immediately return the animal I have adopted to AC&C, without refund, upon AC&C's request.

3. I acknowledge and agree that AC&C makes no representations or warranties as to the health, temperament, habits or background mimal I am adopting and that AC&C shall not be responsible for any expenses associated with the animal following the Adoption.

4. I HEARBY WAIVE ANY CLAIMS AGAINST AC&C AND RELEASE AC&C FROM ANY AND ALL LEGAL LIABILITY to me family members for any loss, damage, injury or expense to me or my family members as a result of the Adoption, due to any cause v (including any and all claims based on negligence, product liability, breach of warranty or any other legal theory), accepting for mys responsibility for any and all such losses, damages, injuries or expenses that may result.

5. I understand that AC&C will in no event refund me the cost of the Adoption, but that AC&C may, at its sole discretion, agree to :xchange of the animal within 30 days of the Adoption.

(a) In the event the adopter's dwelling does not permit pets, AC&C reserves the right to confiscate the animal. I waive any rights or nay have to said animal.

6. In entering into this agreement and agreeing to the Adoption, I am not relying upon any oral or written representation of AC&C, and I have received answers from AC&C to any questions I had in connection with the Adoption.

7. This agreement shall be governed by and construed in accordance with the laws of the State of New York.

**I HAVE READ AND UNDERSTAND THIS AGREEMENT AND AM AWARE THAT BY SIGNING THIS AGREE**
**AM WAIVING CERTAIN LEGAL RIGHTS, INCLUDING THE RIGHT TO SUE AC&C.**

*Myriam Moller - Foley*

Date: 6-19-11

*Delano Harrison*



Animal Care & Control of New York City

Owner ID    PS(

Manhattan Center
326 East 110th Street
New York, NY 10029
www.nycacc.org

Animal ID:    A9(

Date:    6/1

**OWNER:**
MYRIAM MOLLER
2911 CODDINGTON AV, PH
BRONX, NY  10461
718) 319-9819

**ANIMAL:**
MAX, A MALE, UNNEUTERED, DOG
APROX. 2 YEARS OLD, TAN/GRAY
SILKY TERRIER/MIX WITH NO MARKINGS
SOURCE: STRAY ON 6/11/2011

I have been informed by AC&C staff that the above-described animal has the following condition(s):

Notwithstanding, I agree to assume full responsibility for the animal's care, health and behavior. Animal Care & Control of New York City will not be liable for any medical or behavior problems that may exis or occur.

I also agree to permit an AC&C representative to periodically inspect the animal while in my care.

_____          _____          _____
Client's Signature                        Print Name                                    Date

_____          Delores  Harrison              6-19-11
Witness's Signature                     Print Name                                    Date

PetHarbor.com: Animal Shelter adopt a pet dog, cat cute photo

For a shorter link to this pet click here.

Share |

## SUNFLOWER - ID#A900088



I am an unaltered male, tan and gray Silky Terrier mix.

The shelter staff think I am about 2 years old.

I weigh 13 pounds.

I was found in NY 10461.

I have been at the shelter since Jun 11, 2011.

This information is 1 hour old.

For more information about this animal, visit:

Animal Care and Control of New York City - Manhattan

Ask for information about animal ID number: A900088

Back

---

Email This Animal's Info to a friend

Your Email:

Friend's Email:

A Message (optional):

It is a violation of this site's policy to enter any email address other than your own as the sender. **Use of this service implies your agreement with this condition.** If you are sending to an animal rescue group, please check with them before sending. They may already have it.

We reserve the right to ban any user we deem to be using these services irresponsibly.

Email |

Powered By www.PetHarbor.com
Problems with this site? Please help us to help you by emailing info@PetHarbor.com
contents copyright © HLP, Inc. 1997-2007

A++y



## POLICE DEPARTMENT OF THE CITY OF NEW YORK
### Desk Appearance Ticket

Precinct of Arrest : 045            DAT Serial No. : 2011-869            OLBS Arrest-ID : B11657386

The People of the State of New York VS.

Defendant Name : Moller Myrian
Defendant Address : 2911 coddington Ave Bx NY            Age: 61            Date of Birth: 10/20/49

You are hereby summoned to appear in the Criminal Court of the City of New York, to answer a criminal charge made against you.

Top Offense Charged : 165.40
County: Bronx            Arraign/Part: DAT            Time: 0900            Date: 10/04/2011
At LOC: 215 East 161 Street, Bronx, NY 10451

### Instructions for Defendant

You must appear at the time and date indicated above, and present this form to the court clerk.

Should you fail to appear for the offense charged above, in addition to a warrant being issued for your arrest, you may be charged with additional violations of the penal law which upon conviction may subject you to a fine, imprisonment or both. Additionally, if you fail to comply with the directions of this Desk Appearance Ticket, any bail paid will be subject to forfeiture.

Additional Instructions : _____ N/A _____

### Acknowledgement of Defendant:

I, the undersigned, do hereby acknowledge receipt of the above Desk Appearance Ticket, personally served upon me, and do agree to appear as indicated.

Defendant Signature: _M. M. Foley_            Time: 18.35            Date: 7 14 11

Photographed by: POQUIS            Time: 18.10            Date: 7 14 11

FingerPrinted: QUIS

Arresting Officer: QUIS            Shield 31943            Rank: POM            Tax Reg.: 931903

Squad: 45TH PRECINCT            Command: 045            Agency: NYPD

Address of Agency if not NYPD: _____ N/A _____

Was cash bail accepted? NO            Amount: $ 0

_Signature Serving Officer_            7.14.11            _Signature Desk Officer_
                                      Date

2011BX058273

BRONX SUPREME COURT
CRIMINAL DIVISION

THE PEOPLE OF THE STATE OF NEW YORK

v.

1.. MYRIAN MOLLER F/61
    Arrest# B11657386

                                    Defendant

STATE OF NEW YORK

COUNTY OF THE BRONX

D.3~3rd, Prt MY
12/13/11  J. Adler

JASON JAIME states that on or about July 14, 2011 at approximately 12:18 PM at Front of 2911 Coddington Avenue, County of the Bronx, State of New York,

THE DEFENDANT COMMITTED THE OFFENSE OF:
1 (M) P.L. 165.40              Criminal Possession of Stolen Property 5^

IN THAT THE DEFENDANT DID: knowingly possess stolen property, with intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof.

THE GROUNDS FOR THE DEPONENT'S BELIEF ARE AS FOLLOWS:

Deponent states that, at the above time and place, a private house, he observed defendant to have inside her residence his dog.

Deponent further states he is the lawful custodian of aforementioned dog the last time he saw his dog was outside the above location June 9, 2011 at approximately 09:30pm.

Deponent further states that he did not give the defendant permission or authority to take or possess said dog.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE
AS A CLASS A MISDEMEANOR PURSUANT TO P.L. 210.45

Jason Jaime

10/06/2011 (12:39)
_____        _____
DATE and TIME                       SIGNATURE



002019619

SUPREME COURT OF THE STATE OF NEW YORK        FEE:$10.00
BRONX COUNTY
265 EAST 161 STREET
BRONX, NY 10451


CERTIFICATE OF DISPOSITION - MISDEMEANOR/VIOLATION

DATE: 12/23/2011                    CERTIFICATE OF DISPOSITION NUMBER: 42356

PEOPLE OF THE STATE OF NEW YORK        CASE NUMBER:            58273C-2011
            VS.                        LOWER COURT NUMBER(S): 2011BX058273
                                       DATE OF ARREST:         07/14/2011
                                       ARREST #:               B11657386
                                       DATE OF BIRTH:          10/20/1949
MOLLER,MYRIAN

——————————————————————————
            DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 12/14/2011 THE ABOVE ACTION WAS
DISMISSED AND ALL PENDING CRIMINAL CHARGES RELATED TO
THIS ACTION WERE ALSO DISMISSED BY THE HONORABLE  ADLER,H   THEN
A JUDGE OF THIS COURT.

THE DEFENDANT WAS DISCHARGED FROM THE JURISDICTION OF THE COURT.

THE ABOVE MENTIONED DISMISSAL IS A TERMINATION OF THE CRIMINAL
ACTION IN FAVOR OF THE ACCUSED AND PURSUANT TO SECTION 160.60 OF
THE CRIMINAL PROCEDURE LAW "THE ARREST AND PROSECUTION SHALL BE
DEEMED A NULLITY AND THE ACCUSED SHALL BE RESTORED, IN
CONTEMPLATION OF LAW, TO THE STATUS OCCUPIED BEFORE THE ARREST
AND PROSECUTION".

PURSUANT TO SECTION 160.50(1C) OF THE CRIMINAL PROCEDURE LAW, ALL
OFFICIAL RECORDS AND PAPERS RELATING TO THIS CASE ARE SEALED.


IN WITNESS WHEREOF,I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 12/23/2011.


——————————————————————————
            COURT CLERK